**[78]**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|   |   |
|---|---|
| IN RE: COMPLAINT OF WEEKS MARINE, INC. AS OWNER OF THE WEEKS 263 LOADLINE DECK BARGE, WEEKS 272 CARFLOAT AND WEEKS 254 GANTRY CRANE, FOR EXONERATION FROM OR LIMITATION OF LIABILITY | Civil Action No. 04-0494<br><br>OPINION |

**APPEARANCES**

For S.T. Hudson Engineers, Inc.
Edward V. Cattell, Jr.
Hollstein, Keating, Cattell, Johnson & Goldstein, P.C.
Willow Ridge Executive Office Park
750 Route 73 South
Suite 301
Marlton, NJ 08053

For South Jersey Port Corporation:
Dante C. Rohr
Mattioni, LLP
1316 Kings Highway
Swedesboro, NJ 08085

**WOLFSON, UNITED STATES DISTRICT JUDGE**

Before the Court is the Motion for Summary Judgment filed by Defendant S.T. Hudson Engineers, Inc. ("Defendant"), on the Cross-Claim of Plaintiff South Jersey Port Corporation ("Plaintiff"). Plaintiff alleges that the collapse of Berths 1 and 2 of its Beckett Street Marine Terminal ("Beckett Street Terminal"), along the east shore of the Delaware River in Camden, New Jersey, was caused by an underwater landslide that resulted from vibrations created by pile

driving conducted by Weeks Marine, Inc., and overseen by Defendant, during construction of the Battleship USS New Jersey Memorial Pier.  After an initial coverage dispute, Plaintiff reached a settlement with its insurance carrier, Lexington Insurance Company ("Lexington"), in which Lexington paid Plaintiff $7,315,926 for Plaintiff's damages associated with the collapse at the Becket Street Marine Terminal.  As part of that settlement, Lexington purported to assign its right to pursue an action in subrogation against any third-party tortfeasor to Plaintiff.

Plaintiff bases this action against Defendant on two separate theories.  First, Plaintiff asserts that, as the assignee of Lexington's subrogation rights, Plaintiff stands in Lexington's shoes and may assert any action Lexington would have been entitled to initiate against Defendant.  Consequently, Plaintiff argues that it may recover damages to the extent of Lexington's rights against a tortfeasor.  Second, Plaintiff asserts that, notwithstanding the operation of equitable subrogation or Plaintiff's status as assignee of Lexington's subrogation rights, Plaintiff retains an independent right to sue a tortfeasor for the balance of Plaintiff's losses not compensated by its insurance settlement with Lexington.

In this Motion for Summary Judgment, Defendant argues that Plaintiff is precluded from pursuing an action against it for damages arising out of the Beckett Street Terminal collapse because:  (1) Plaintiff's independent right to assert a claim against Defendant, or any other tortfeasor, was extinguished upon Plaintiff's settlement with Lexington, by the operation of equitable subrogation; (2) Lexington's purported assignment of its subrogation rights to Plaintiff violates the Supreme Court of New Jersey's prohibition against pre-judgment assignment of tort claims; (3) even if Lexington's assignment to Plaintiff is valid, Plaintiff is bound by judicial estoppel to the factual position taken by Lexington in earlier litigation, during which Lexington

2

disputed Defendant's responsibility for Plaintiff's damages; and (4) Plaintiff has been fully compensated by its settlement with Lexington, thus a successful action against Defendant would result in a double recovery, in violation of the equitable principles underlying subrogation.  The Court has jurisdiction pursuant to 28 U.S.C. § 1331.  For the reasons that follow, Defendants' Motion for Summary Judgment is granted.

I.    BACKGROUND

Plaintiff is an agency of the State of New Jersey and statutorily responsible for operation of the Beckett Street and Broadway Marine Terminals on the east shore of the Delaware River in Camden, New Jersey. See N.J. Stat. Ann.§ 12:11A-1, et seq.  In Fall 2000, Plaintiff purchased an insurance policy from Lexington for coverage of all risks associated with its operation of the Beckett Street and Broadway Marine Terminals during the period between December 15, 2000 and December 15, 2001. See Certification of Dante C. Rohr ("Rohr Cert."), submitted in support of Plaintiff's Opposition Brief ("Pf Opp. Br."), Ex. 1.  The policy was subject to a specified list of exclusions, and carried a maximum of $15 million in coverage per single occurrence. Id.

Defendant has served as the Port Engineer for Plaintiff since its formation in 1969 See Plaintiff's Cross-Claim against Defendant ("Cross-Claim"), at ¶ 11.  For over thirty years, Defendant has controlled the marine engineering for Plaintiff's terminals, and has maintained responsibility for, among other things, the conduct of periodic condition surveys of the berths at the Becket Street Terminal, as well as inspection of its other marine structures. Id.  In 1998, after a condition survey of Berths 1 and 2 of the Beckett Street Terminal, Defendant designed a repair

plan to be carried out by W.H. Streit[1], in early 2001, on the number 1 steel auxiliary H-piles of Berths 1 and 2. Id. at ¶¶ 15, 18, 20. At the same time, Defendant served as the design engineer overseeing Weeks Marine's construction of Memorial Pier. Id. at ¶¶ 20-22. Memorial Pier is located upriver and adjacent to Berth 1 of the Beckett Street Terminal. Id. ¶ 16. Construction of the pier required "the driving of numerous large piles including 16 and 18 inch steel pipe piles, plate anchors and eight foot diameter monopiles." Id. at ¶¶ 24-35.

On August 22, 2001, a section of Berth 1 of the Beckett Street Terminal collapsed and sank into the Delaware River, along with Plaintiff's Number 5, Clyde-Whirley crane. Id. at ¶ 38. An additional section of Berth 1 collapsed on December 5, 2001. Id. at ¶ 41. On November 14, 2001, Plaintiff filed a claim with Lexington in which Plaintiff alleged losses in excess of $15 million and asserted that the pile driving conducted by Weeks Marine during the construction of the Memorial Pier caused the collapse at the Beckett Street Terminal. See Rohr Cert., Ex. 3. On November 30, 2001, Plaintiff sent Lexington a "Sworn Statement in Proof of Loss" which itemized $14,716,328 worth of losses Plaintiff allegedly suffered. See Affidavit of Edward V. Cattell ("Cattell Aff."), submitted in support of Defendant's Summary Judgement Brief ("Df Br."), Ex. B. On December 11, 2001, Plaintiff sent Lexington a supplemental "Sworn Statement in Proof of Loss" which included an additional $36,183 in business interruption losses. See Cattrell Cert., Ex. C.

Lexington retained an engineering firm to perform an independent evaluation of Plaintiff's losses, and, relying on the firm's report, denied Plaintiff's claim. Id. at Ex. 4.

---

[1] W.H. Streit was awarded the construction process as the result of a competitive bid. See Rohr Cert., Ex. 3, pg. 2; Cross-Claim at ¶ 15.

Lexington took the position that Plaintiff's losses did not occur during the policy period. Id. Specifically, Lexington asserted that the collapse of Berth 1 did not result from a landslide caused by Weeks Marine's pile driving activity at the Memorial Pier, but rather, that it resulted from broken pilings, damaged long before the policy period began, that failed due to normal wear and tear. Id. On December 19, 2001, Plaintiff filed a Declaratory Judgment Action against Lexington in the Superior Court of New Jersey, alleging breach of contract and bad faith. See Rohr Cert., Ex. 5.  Lexington removed the matter to a court in this District on January 18, 2002. Id.

Before trial, Lexington and Plaintiff reached a settlement and, on April 23, 2004, executed a Release and Settlement Agreement ("Settlement Agreement"). Id. at Ex. 7.  Pursuant to the terms of the Settlement Agreement, Lexington paid Plaintiff $7,315,926.00 as "full and final payment under the Policy for all losses and/or claims arising out of the collapses." Id, at Ex. 7, ¶ 1.  In exchange, Plaintiff "release[d] and fully discharge[d] all claims . . . for coverage under the Policy . . . against . . . Lexington...." Id. at ¶ 4.  The Settlement Agreement also incorporated the terms of an Assignment and Relinquishment of Subrogation Rights executed between Plaintiff and Lexington, under which Lexington assigned its rights of subrogation to Plaintiff, and relinquished those rights.[2] Id. at Ex. 8, ¶¶ 1, 4.

---

[2] Specifically, the relevant provisions state:

1. Assignment. [Lexington] [does] hereby absolutely, completely and forever, relinquish their rights of subrogation, if any, whether existing at law, in equity, or by contract, or otherwise, and do hereby transfer, assign and forever grant and confer such rights to [Plaintiff] related to their payment of this compromise settlement.

4. Relinquishment. [Lexington] irrevocably and intentionally relinquish any and all rights of subrogation,

5

Subsequently, in this case, Plaintiff filed claims against various defendants, some of whom responded with cross-claims, and counter-claims. The details of those various claims are unnecessary for the disposition of this Motion, except to note that on July 13, 2004, Plaintiff filed a cross-claim against Defendant for negligence, breach of contract, trespass, and nuisance.[3] On October 31, 2005, Defendant filed this Motion, pursuant to Fed. R. Civ. P. 56(c), seeking Summary Judgment on Plaintiff's Cross-Claim. Id. at Ex. 9 at ¶¶ 46-68.

### III.    DISCUSSION

#### A.    Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id. The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment. Celotex, 477 U.S. at 330. Once the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the non-moving party must "do more than simply show that there is

---

and do hereby confirm that in any action by [Plaintiff] to recover for its losses and damages, [Plaintiff] has the consent and agreement of [Lexington] to pursue its claims in [Plaintiff's] own name, as the real party in interest.

[3]As part of its July 13, 2004 Cross-Claim Plaintiff also asserted an action against Hill alleging negligence, trespass, and nuisance. Rohr Cert., Ex. 9, at ¶¶ 69-82

6

some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

On this Motion, Defendant essentially argues that there is no legal basis to support a claim against it by Plaintiff. To set the groundwork for its argument, Defendant asserts that Plaintiff's independent right to bring a claim against it, or any other tortfeasor potentially responsible for the collapse at the Becket Street Terminal, was extinguished by operation of the doctrine of equitable subrogation when Plaintiff accepted payment for its losses from Lexington. Thus, according to Defendant, Plaintiff's claims against it arise solely out of Lexington's assignment of its subrogration rights to Plaintiff. Defendant next attacks the validity of that assignment and argues that it is invalid. As a result, Defendant asserts Plaintiff is divested of a right to sue Defendant, and lacks a legal basis for its Cross-Claim. Assuming the possibility that I might find Lexington's assignment of its subrogation rights to Plaintiff valid, Defendant also presents certain other alternative arguments. Among them is Defendant's most meritorious argument, that Plaintiff has been fully compensated for it losses and is barred from receiving a double recovery. Before addressing that point, I discuss Defendant's other contentions.

**B.     Subrogation and Plaintiff's Independent Right of Action Against Defendant**

"Subrogation is a device of equity to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it." Standard Accident Ins. Co. v. Pellecchia, 15 N.J. 162, 171 (1954); see also Culver v. Ins. Co. North America, 115 N.J. 451, 455 (1989). It most often comes into play in cases in which "an insurer who has indemnified an insured for damage or loss is subrogated to any rights that the insured may have against a third party, who is also liable for the damage or loss." Pellecchia, 15 N.J. at 171. In such cases, equity demands that

7

the insurer be reimbursed for its payment to the insured, "otherwise either the insured would be unjustly enriched by virtue of a recovery from both the insurer and the third party, or in the absence of such double recovery by the insured the third party would go free despite the fact that he has the legal obligation in connection with the loss or damage." Id.  "'The process is analogous to the creation of a constructive trust, the creditor being compelled to hold his rights against the principal debtor, and his securities, in trust for the subrogee.'"Id. at 171 (quoting Camden Trust Co. v. Cramer, 136 N.J. Eq. 261, 264 (E. & A.1944)). "Subrogation is highly favored in the law." Pellecchia, 15 N.J. at 171; see also Culver, 115 N.J. at 456.

Subrogation rights are created in one of three ways: (1) an agreement between the insurer and the insured, (2) a right created by statute, or (3) a judicial device of equity to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it. Culver, 115 N.J. at 456 (internal quotations and citations omitted).  In the insurance context, in the absence of a controlling contract or statute, the right of subrogation exists without the consent of the insured. Pellecchia, 15 N.J. at 172.  However, parties to a valid contract may, by agreement, waive or limit that right. Id.  A subrogee asserting a claim against a third-party tortfeasor, in effect, steps into the shoes of the insured and can recover only if the insured likewise could have recovered. Id. (citing Sullivan v. Naiman, 130 N.J.L. 278, 280 (Sup. Ct. 1943)).  In other words, a subrogee is subrogated only to those rights of the insured that are sufficient to reimburse it for the amount for the loss paid. Culver, 115 N.J. at 457 (citing Restatment 2nd of Restitution § 162, comment c (1937)).  The subrogee is subject to all legal and equitable defenses that the third party may have either against it or against the insured and "there can be recovery only if the cause is just and enforcement is consonant with right and justice." Pellecchia, 15 N.J. at 173 (citing

8

Bater v. Cleaver, 114 N.J.L. 346, 353 (E. & A.1935)).

Unless otherwise required by contract, an insured must be made whole before an insurer can be subrogated to the insured's rights against a tortfeasor.[4] Culver, 115 N.J. at 457; McShane v. N.J. Mfrs. Ins. Co., 375 N.J. Super. 305, 312 (App. Div. 2005).  Furthermore, "an insured is not liable to the insurer for moneys received from a tortfeasor, where the total of [the insured's] recovery from both the insurer and the tortfeasor does not exceed [the insured's] loss." Federal Insurance Co. v. Engelhorn, 141 N.J. Eq. 349, 351 (E. & A. 1947).  The logical implication of such a rule is that an insured who recovers only part of its loss from its insurer retains an independent cause of action against any alleged tortfeasor until the insured has been fully compensated.[5] See, e.g., Charnecky v. American Reliance Ins., 249 N.J. Super. 91, 94-94 (App.

---

[4] Indeed, New Jersey is among the "vast majority of jurisdictions" that observe such a rule. See McShane, 375 N.J. Super. at 312 (citing Elaine M. Rinaldi, Apportionment of Recovery Between Insured and Insurer in a Subrogation Case, 29 Tort & Ins. L. J. 803 (Summer 1994); Roger M. Baron, Subrogation: A Pandora's Box Awaiting Closure, 41 S.D. L. Rev. 237 (1996)).

[5] There is a dearth of direct controlling authority to support this rule, however, commentators have endorsed it. See 17 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 241:45 (3d ed. 2005) ("the insured may bring an action against the wrongdoer for the portion of the loss in excess of the insurer's payment, or the full amount of the loss where an insurer pays only a part of the insured's loss, but the insured holds the fund recovered in the action subject to a trust in favor of the insurer to the extent that the insurer is entitled to subrogation if the ultimate recovery makes the insured whole and has an excess to cover payments previously made by the insurer.") (citations omitted); 46A C.J.S. Insurance § 1493 (2006) ("Where the loss exceeds the amount of the insurance, so that payment under the insurance contract constitutes but a partial satisfaction of the damages sustained, leaving a residue to be made good by the wrongdoer, it has been held that insured may maintain in his own name the action against the tort-feasor, which may be for his own benefit and for the benefit of the insurance company.") (citations omitted).

The opposite rule would result in an injustice to an injured insured left without recourse to be made whole for its injuries.  For example, assume "A" is under-insured to a maximum coverage amount of $5 million and suffers an injury resulting in $10 million worth of loss.  If "A" has no right to accept full payment from its insurer to its $5 million coverage limit *and* assert an independent claim against the third-party tortfeasor, "A" would be left uncompensated for *half* its actual damages.  Surely the law does not force such an insured to chose between accepting the limit of its insurance coverage in partial compensation for its damages, *or* pursuing a claim against the third-party tortfeasor for its total damages. Such a rule would produce the inequitable result of allowing a guilty tortfeasor to benefit from the poor

9

Div. 1991) (explaining in dicta that "despite the insurer's general subrogation right, it is clear that if an insured who has recovered only part of his loss from his insurer then recovers an additional payment from the tortfeasor, he has no liability to repay the insurer unless the total recovery exceeds his total loss."), overruled on other grounds by Frazier v. New Jersey Mfrs. Ins., 142 N.J. 590, 605 (1995).  If an insured receives payment from an insurer for part, but not all of its damages, and later pursues an action against a third party tortfeasor, any amount the insured recovers in excess of its actual damages will be available to the insurer in an action for reimbursement. See, e.g., Providence Washington Ins. Co. v. Hogges, 67 N.J. Super. 475 (App. Div.1961) (holding that an insured must be made whole before an insurer can obtain reimbursement from him for benefits paid or can be subrogated to his rights against a tortfeasor).

Despite Defendant's argument to the contrary, I find that Plaintiff retained an independent right to sue it, or any other potentially responsible tortfeasor, to recover the balance of its damages not satisfied by its settlement with Lexington, assuming the existence of such damages. Accordingly, Plaintiff's Cross-Claim against Defendant does not depend necessarily on the validity of Lexington's assignment of its subrogation rights to it.  I turn now to Defendant's argument on that issue.

C.       **Lexington's Assignment of its Subrogation Rights to Plaintiff**

Defendant argues that Lexington's assignment of its subrogation rights to Plaintiff is invalid because it violates the New Jersey Supreme Court's prohibition against pre-judgment assignment of tort claims.  While the issue is not dispositive, the validity of Lexington's assignment does impact the disposition of Defendant's Motion.  Accordingly, I briefly address

---

coverage decision of an insured and escape responsibility for the harm it caused.

the argument.

"New Jersey law clearly forbids the assignment of prejudgment tort claims." Integrated Solutions, Inc. v. Technical Support Specialties, Inc., 124 F.3d 487, 490 (3d Cir. 1997). New Jersey Courts have consistently held such assignments invalid, as a matter of public policy, to protect injured, and potentially unsophisticated, parties from falling prey to the schemes of "'unscrupulous strangers.'" Kimball Int'l, Inc. v. Northfield Metal Prods., 334 N.J. Super. 596, 612 (App. Div. 2000) (quoting Caldwell v. Ogden Sea Transp., Inc., 618 F.2d 1037, 1048 (4th Cir. 1980)); Village of Ridgewood v. Shell Oil Co., 289 N.J. Super. 181, 195 (1996) ("A tort claim cannot be assigned prior to judgment."); Costanzo v. Costanzo, 248 N.J. Super. 116, 121 (1991) ("[I]n New Jersey, as a matter of public policy, a tort claim cannot be assigned."); see also Conopco, Inc. v. McCreadie, 826 F. Supp. 855, 865-67 (D.N.J. 1993) ("It is clear that under New Jersey law, choses in action arising out of tort are not assignable prior to judgment.").

While this bar has traditionally extended to all tort claims, "[m]ore recent cases have indicated that the non-assignability rule applies only to tort claims for personal injuries." Kimball, 334 N.J. Super. at 613 n.6 ("The limitation of the non-assignability rule to personal injury claims is consistent with the rule in most other jurisdictions which still maintain some restrictions upon the assignability of claims."); Di Tolvo v. Di Tolvo, 131 N.J. Super. 72, 78 (App. Div. 1974) ("a claim for damages in tort for personal injuries cannot be made the subject of assignment before judgment"); Berkowitz v. Haigood, 256 N.J. Super. 342, 346 (Law. Div. 1992) ("a claim for damages in tort for personal injuries is not assignable before judgment."). But see Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders In Het Kaptiaal Van

11

Saybolt Int'l B.V. v. Schreiber, 407 F.3d 34, 46-47 (2nd Cir. 2005).[6]

Except for the prohibition against assignment of tort claims, New Jersey law otherwise allows the assignment of a claim for money damages arising out of contractual rights. Kimball, 334 N.J. Super. at 612.  In that connection, N.J. Stat. Ann. § 2A:25-1 provides in pertinent part:

> All contracts for the sale and conveyance of real estate, all judgments and decrees recovered in any of the courts of this state or of the United States or in any of the courts of any other state of the United States and *all choses in action arising on contract shall be assignable,* and the assignee may sue thereon in his own name. In such an action, the person sued shall be allowed, not only all set-offs, discounts and defenses he has against the assignee, but also all set-offs, discounts and defenses he had against the assignor before notice of such assignment was given to him....

(emphasis added).  While New Jersey courts have "broadly construed" N.J. Stat. Ann. § 2A:25-1, Kimball, 334 N.J. Super. at 612, they have also noted that the assignability of contract rights may be limited by operation of law or public policy. Somerset Orthopedic Assocs., P.A. v. Horizon Blue Cross & Blue Shield of N.J., 345 N.J. Super. 410, 415 (App. Div. 2001).

In this case, Plaintiff argues that Lexington's assignment of its subrogation rights to it is valid under N.J. Stat. Ann. § 2A:25-1 because it merely assigns to Plaintiff a chose in action "arising on contract."  Plaintiff notes that its insurance policy with Lexington expressly creates Lexington's subrogation right, and modifies it according to the parties' interests.[7]  Defendant

---

[6] In Stichting, Judge Calabresi surveyed New Jersey law and found that while recent cases "suggest that New Jersey law may be changing" in the area, the prohibition against assignment of pre-judgment tort claims extends to *all* such claims. 407 F.3d 34, 47 n.6.

Notwithstanding the holding of the Second Circuit in Stichting, I predict that the New Jersey Supreme Court would recognize the trend among its lower courts and hold that the prohibition on assignment of tort claims is limited to personal injury claims.  However, I need not rule on that question because I find that the chose in action assigned by Lexington to Plaintiff in this case arose out of contract, and, as a matter of law, is assignable.

[7] The insurance policy between Lexington and Plaintiff provides in relevant part:

In the event of any payment under this Policy, this company shall be subrogated to the extent of such

counters that the underlying action assigned by Lexington to Plaintiff is a tort claim that did not *itself* arise out the contract between Plaintiff and Lexington. Thus, Defendant argues that the assignment is invalid under New Jersey law because it merely assigns a pre-judgment tort claim from Lexington to Plaintiff.

In support of its argument, Plaintiff relies heavily on the holding of the Appellate Division of the Superior Court of New Jersey in Kimball Int'l, Inc. v. Northfield Metal Prods. 334 N.J. Super. 596 (App. Div. 2000). In that case, a plaintiff (Baker) sued the manufacturer of a chair (Kimball) for personal injuries he suffered after the chair collapsed. Id. at 602. During discovery, the parties learned that a third party (Northfield) manufactured an allegedly defective component of the chair. Id. The trial court denied Baker's motion to join Northfield, and Kimball commenced a separate action against Northfield alleging claims for contribution and indemnification. Id. Thereafter, Kimball settled the action with Baker and agreed to assign Baker a partial interest in its indemnification claim against Northfield. Id. In a motion for summary judgment, Northfield challenged the purported assignment as against public policy. Id. The trial court rejected Northfield's argument, but granted summary judgment in its favor on other grounds. Id. at 603.

In a cross-appeal, Northfield again argued that Kimball's assignment of part of its

---

payment to all the insured's rights of recovery therefor. The insured shall execute all papers required and shall do anything that may be necessary at the expense of the company to secure such right. The company will act in concert with all other interests concerned, i.e., the insured and other company[ies] participating in the payment of any loss as primary or excess insurers, in the exercise of such rights of recovery. If any amount is recovered as a result of proceedings, the net amount recovered after deducting the costs of recovery shall be divided between the interests concerned in the proportion of their respective interests. If there should be no recovery, the expense of proceedings shall be borne proportionateley by the interests instituting the proceedings.

See Rohr Cert., Ex. 1, pg. 13.

indemnity claim to Baker was invalid. Id. at 604. However, the appellate court affirmed the trial court, and held that the assignment fell within the scope of those permissible under a predecessor statute to N.J. Stat. Ann. § 2A:25-1.[8] Id. at 613. The appellate court noted that a claim for indemnity might arise in equity or by contract, but held that "however the right to indemnity might be characterized, the foundation of Kimball's indemnification claim ... [was] the contract under which it purchased Northfield's component parts for its office chair," and thus, constituted a chose in action arising under contract which Kimball was free to assign to Baker. Id.

Here, the foundation for Lexington's subrogation claim is its insurance policy with Plaintiff. That contract expressly creates the chose in action that Lexington assigned to Plaintiff. While the underlying action may sound in tort, Lexington's subrogation right is more in the nature of a claim for reimbursement, and, therefore, similar to the indemnity action that was the object of the assignment in Kimball. Indeed, Lexington's right to sue a tortfeasor potentially liable for Plaintiff's damages is limited to the extent of Lexington's payment to Plaintiff under the insurance policy. Contrary to Defendant's argument, Plaintiff's tort claim was not transferred to Lexington by operation of subrogation. Thus, Lexington could never have assigned that claim back to Plaintiff. Instead, Lexington assigned its limited right to reimbursement, created by contract, to Plaintiff. Accordingly, despite its unusual nature, the assignment falls within the scope of those permissible under N.J. Stat. Ann. § 2A:25-1.[9]

---

[8] In 2002, the New Jersey Legislature amended N.J. Stat. Ann. § 2A:25-1, however, that amendment did not affect the essential nature of the statute, nor the specific language regarding assignability of choses in action arising on contract. See L.2001, c. 386, § 137, eff. Jan. 8, 2002 (adding last line of current statute).

[9] Defendant argues that Lexington agreed to assign its subrogation rights to Plaintiff because Lexington believed the rights to be valueless. See Df Br. at pg. 9. Defendant asserts that experts hired by Lexington during Plaintiff's declaratory action against it refuted Plaintiff's theory of liability against Defendant, and, therefore, rendered a claim against Defendant meritless. Id. Plaintiff alleges, without

However, that does not end the discussion of the propriety of the assignment. As set forth earlier, the assignability of contract rights may be limited by operation of law or public policy. Somerset Orthopedic, 345 N.J. Super. at 415. Indeed, although the free assignment of choses in action may be a valuable goal of public policy, it will not override competing, superior public interests.[10] Id. I find that Lexington's purported assignment of its subrogation rights to Plaintiff violates a basic principle of equity, and a fundamental concept underlying the doctrine of subrogation because under the facts of this case, the assignment would result in a double recovery to Plaintiff. Thus, for the reasons discussed more fully below, I conclude that the assignment is invalid.

**D.     Double Recovery and Plaintiff's Damages**

Defendant argues that Plaintiff may not pursue a claim against it arising out of Lexington's assignment of its subrogation rights, or by virtue of Plaintiff's independent tort right against it, because such an action, if successful, would result in a double recovery for Plaintiff. Defendant asserts that Plaintiff has been made whole by Lexington's payment to it. Plaintiff

---

citation to the record, that it offered valuable consideration in exchange for the assignment from Lexington. See Pf Br. at pg. 1. Defendant responds by noting the September 29, 2005 deposition testimony of Joseph A. Balzano ("Balzano"), Executive Director of South Jersey Port Corporation, in which Balzano testifies that Lexington did not receive a set-off against the amount it paid Plaintiff in settlement of the declaratory action, in exchange for the assignment of its subrogation rights. See Cattell Aff., Ex. A.

[10] See, e.g., N.J. Stat. Ann. § 34:11-4.14 (generally prohibiting assignment of wages); N.J. Stat. Ann. § 34:15-29 (precluding assignment of workmen's compensation claims or awards); Cureton v. Joma Plumbing & Heating Co., 38 N.J. 326, 333 (1962) (to the same effect); N.J. Stat. Ann. § 43:21-15(c) (precluding assignment of unemployment benefits); Village of Ridgewood, 289 N.J. Super. at 195 (prohibiting assignment of tort claim prior to judgment); Parkway Ins. Co. v. N.J. Neck & Back, 330 N.J. Super. 172, 183-88 (Law Div. 1998) (holding that limitations imposed by N.J. Stat. Ann. 39:6A-4(e) on assignment of medical expense benefits without the written consent of the insurer in insurer's auto insurance policies are enforceable against medical provider assignees because they advance the public policy of cost reduction).

responds by asserting that it has not been made whole because the extent of its damages exceeds the payment made by Lexington. Having considered the evidence in the light most favorable to Plaintiff, as I must on this motion for summary judgment by Defendant, I find that Plaintiff has failed to raise a material factual dispute as to Defendant's assertion that Lexington's $7,315,926 insurance payment fully compensated Plaintiff for all of its losses arising out of the Beckett Street Terminal collapses. Consequently, any additional recovery by Plaintiff for the collapses -- whether the product of an independent tort action by Plaintiff against Defendant as a third-party tortfeasor, or as an assertion of Lexington's subrogation rights -- would constitute a double recovery, barred by general equitable principles.

To be sure, New Jersey law clearly disfavors double recoveries by injured plaintiffs. See Daily v. Somberg, 28 N.J. 372, 383 (1958) (the release of a settling joint tortfeasor will also release the nonsettling joint tortfeasor if "the consideration constitutes full compensation or is accepted as such"). See, e.g., Village of Ridgewood, 289 N.J. Super. at 196 ("Since [the plaintiff] was fully compensated for its losses ... it had no surviving claims which it could assert against the remaining defendants."). See also Tp. of Wayne v. Messercola, 789 F. Supp. 1305, 1312 (D.N.J. 1992) (quoting Daily, 28 N.J. at 383); Barticheck v. Fidelity Union Bank/First National State, 680 F. Supp. 144, 145 (D.N.J. 1988) (same).[11] Indeed, the very concept of subrogation arose, in part, out of an effort to avoid the inequity of a double recovery by an insured from both an insurer and a tortfeasor. See Pellecchia, 15 N.J. at 171.

---

[11] Daily, Village of Ridgewood, Messercola, and Barticheck, although factually distinct, address the same legal principle. Those cases each involved a plaintiff who accepted payment from, and executed a release for the benefit of, one of several joint tortfeasors. Later, one or all of the non-settling tortfeasors argued that the settlement accepted by the plaintiff constituted *full compensation* for the plaintiff's injuries, thus barring any action seeking additional recovery for those injuries. While this case does not involve joint tortfeasors, the operative legal principle is the same.

Here, Defendant argues that Plaintiff's settlement with Lexington was intended to fully compensate Plaintiff for all losses associated with the Beckett Street Terminal collapses, and release not only Lexington but all other potentially liable parties as well. Defendant's position is not sustainable. The unambiguous language of the Settlement Agreement between Plaintiff and Lexington states that Plaintiff accepts the settlement as "full and final payment *under the Policy.*" See Rohr Cert., Ex. 7, at ¶ 1 (emphasis added). The provision does not address the matter of additional compensation potentially available to Plaintiff from other parties. Nor can the release contained in the Settlement Agreement be construed to apply to any party other than Lexington, or any claims other than those "under the Policy." Id. at ¶ 4. Contrary to Defendant's argument, therefore, the Settlement Agreement, which was intended to be a compromise agreement, did not automatically divest Plaintiff of its independent right to seek additional recovery from Defendant or any other alleged tortfeasor if additional losses exist and can be attributed to those parties. Thus, Plaintiff's right to independently pursue recovery from Defendant for its alleged losses in excess of those compensated by Lexington's insurance payment depend upon Plaintiff's actual demonstration of such remaining, uncompensated losses.

I find, however, that the evidence in the record regarding the extent of Plaintiff's total losses arising out of the Beckett Street Terminal collapse leaves no material factual dispute that Lexington's payment to Plaintiff fully compensated Plaintiff for all of its damages. On December 15, 2001, Plaintiff sent Lexington a "Sworn Statement in Proof of Loss" which itemized $14,716,328 worth of damages Plaintiff allegedly suffered. See Cattell Aff., Ex. B. Among Plaintiff's itemized damages was $2 million in estimated replacement costs for Plaintiff's lost crane, as well as more than $10 million in estimated replacement costs for the pier

17

at the Becket Street Terminal. Id.  Plaintiff concedes that in this litigation it is not entitled to the replacement value of such losses, as was the case under Plaintiff's insurance policy, and instead, it is entitled only to the depreciated or "actual value" of its losses. See Pf. Opp. Br. at pg.1 n.1.

Those revised damage estimates are included in the February 18, 2005, Statement of Damages ("Statement") Plaintiff submitted in connection with this litigation.  In that Statement, Plaintiff asserts that his damages associated with the Beckett Street Terminal collapse total $6,303,796, excluding interest.[12] See Cattell Cert., Ex. C.  The Statement includes $4,524,712 in actual value damages to the pier at the Becket Street Terminal. Id.  Additionally, the Statement lists the actual value damage for Plaintiff's crane (which was listed originally at more than $2 million) at $170,000. Id.  Plaintiff's Statement makes no mention of what, if any, losses from its original insurance claim were compensated by the $7,315,926 Plaintiff received from Lexington. Rather, it simply re-lists the items with which its largest damage estimates were associated in its claim to Lexington, but attaches revised loss values to those items.[13]

After carefully reviewing the record detailing Plaintiff's losses as a result of the Beckett Street Terminal collapse, I find no material factual dispute that Plaintiff has been made whole for its losses.  Plaintiff was on notice of Defendant's challenge to the factual basis for Plaintiff's

---

[12] The value of Plaintiff's prejudgment interest is not relevant to a calculation of Plaintiff's actual damages resulting from the collapses, therefore I omit that figure from my consideration of Plaintiff's proofs.

[13] In its claim to Lexington, Plaintiff did not originally estimate damages for business interruption / economic loss, but rather listed such damages as "to be determined."  Later, Plaintiff filed a supplemental Statement of Damages with Lexington in which it estimated such losses at $36,183. According to Defendant, Plaintiff "has since stated that it is not seeking to recover any damages for business interruption/economic loss." Df. Reply Br. at pg. 4 n.1.  Plaintiff does not dispute that assertion. Even if Plaintiff has not abandoned its claim for such losses, the only evidence in the record of such damages establishes a value of $36,183. See Cattell Cert., Ex. C.  That amount does not increase the damages alleged by Plaintiff in this litigation beyond the amount already paid by Lexington.

claim that it suffered losses beyond those compensated by the $7,315,926 paid by Lexington. However, Plaintiff produced no evidence of such distinct, additional damages. In the absence of any evidence to the contrary, I am left with no doubt that Plaintiff has been made whole for its losses. Consequently, Plaintiff may not pursue further recovery of damages from Defendant by virtue of an independent tort claim, or by way of the rights assigned to it by Lexington.[14] Any such additional recovery would constitute a double recovery.[15]

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary judgment is granted and Plaintiff's Cross-Claim against Defendant is dismissed.

An appropriate Order shall follow.

/s/ Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge

---

[14] I emphasize that it is Plaintiff's position that Plaintiff is entitled to assert Lexington's assigned subrogation rights and recover from Defendant to the full extent of Lexington's right of reimbursement for its payment to Plaintiff. In other words, Plaintiff asserts that it is entitled to a true double recovery, that is, payment of $7,315,926 from Lexington, and an additional payment of $7,315,926 from Defendant, as Lexington's assignee. The argument lacks sufficient merit to warrant further discussion. While the purported assignment between Lexington and Plaintiff may not be barred by New Jersey's prohibition against assignment of pre-judgment tort claims, the obvious double recovery that would result from such an assignment is sufficient to render it invalid. That conclusion renders discussion of Defendant's judicial estoppel argument unnecessary. However, I note that the doctrine of judicial estoppel only applies when a court has accepted a party's position, and , a party is not ordinarily barred from taking an inconsistent position in successive litigation if the first action was, as here, concluded by settlement. See Kimball, 334 N.J. Super. at 607-08.

[15] In support of its right to full recovery from Defendant on a claim as Lexington's assignee, Plaintiff raises the collateral source rule, and asserts that there can be no set-off against its potential recovery to reimburse Lexington. Pl. Br. at pg. 15 (citing Rusk v. Jeffries, 110 N.J.L. 307, 311 (E & A 1933)). The collateral source rule is limited the personal injury context, and thus, inapplicable in this case. See generally Perreira v. Rediger, 169 N.J. 399 (2001) (discussing the common law collateral source rule and its application as codified in N.J. Stat. Ann. 2A: 15-97).

Date: June 30, 2006.